## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **JODY MATHERNE** | * | **CIVIL ACTION NO.  2:13-cv-6689** |
| | * | |
| **VERSUS** | * | **SECTION "____" (____)** |
| | * | |
| **ARMOUR-ECKRICH MEATS LLC;** | * | **JUDGE:** |
| **JOHN MORRELL & CO.; and** | * | |
| **SMITHFIELD FOODS, INC.** | * | **MAGISTRATE:** |
| | * | |
| | * | **JURY TRIAL REQUESTED** |
| | * | |

**************************************************************************

### COMPLAINT FOR DAMAGES

NOW INTO COURT, through undersigned counsel, comes Plaintiff, JODY MATHERNE, who respectfully brings this Civil Action for Damages under Louisiana Revised Statutes, Title 23, Section 967 and Title 30, Section 2027 due to the retaliatory conduct of his employer, ARMOUR-ECKRICH MEATS LLC, a major subsidiary of JOHN MORRELL & CO. (a.k.a. JOHN MORRELL FOOD GROUP) and SMITHFIELD FOODS, INC., who on June 27, 2013 wrongfully terminated him for engaging in activity protected by Louisiana's Employee Protection from Reprisal Statute. For his case, Plaintiff respectfully pleads the following:

### PARTIES

1.      Plaintiff, JODY MATHERNE (hereinafter referred to as "Plaintiff"), is a citizen of the United States and is a resident of the State of Louisiana in the Parish of St. Charles.

2.      Defendant, ARMOUR-ECKRICH MEATS LLC (hereinafter referred to as "AEM"), is a company domiciled in the State of Delaware, which entity, at all times pertinent hereto, was doing and licensed to do business in the State of Louisiana and, further, maintains its Principal Business Office at 142 Tortorice Lane, Independence, LA 70443.  AEM has designated its Registered Agent for service of process in Louisiana as FRANK JENKINS at 142 Tortorice

Lane, Independence, LA 70443.

3.      Defendant, JOHN MORRELL FOOD GROUP & CO. (hereinafter referred to as "JMFG") is a company domiciled in the State of Delaware, maintains its Principal Business Office at 805 E. Kemper Ave., Cincinnati, OH 45246, maintains its Principal Business Establishment in Louisiana at 400 Poydras St., New Orleans, LA 70130 and at all times pertinent hereto was licensed to do and doing business in the State of Louisiana.  JMFG has designated as its Registered Agent for service of process in Louisiana as CT Corporation System, 5615 Corporate Blvd., Suite 400B, Baton Rouge, LA 70808. JMFG operates under the Ohio licensed fictitious name JOHN MORRELL FOOD GROUP (hereinafter referred to as "JMFG").

4.      Defendant, SMITHFIELD FOODS, INC. (hereinafter referred to as "Smithfield") is a company domiciled in the State of Delaware who has designated its Registered Agent for service of process The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801.

5.      AEM is a major subsidiary of JMFG.

6.      JMFG is a wholly owned subsidiary of Smithfield.

## JURISDICTION AND VENUE

7.      This Court maintains subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332.

8.      Complete diversity exists between Defendants, AEM, JMFG and Smithfield, who are all domiciled in Delaware and Plaintiff, who is domiciled in Louisiana.

9.      The amount in controversy exceeds SEVENTY-FIVE THOUSAND DOLLARS ($75,000), exclusive of interest and costs.

10.     Venue is appropriate in this venue because Defendants, AEM and JMFG,

maintain offices within the territory of the United States District Court for the Eastern District of Louisiana and the incidents giving rise to this cause of action all occurred within this same federal district.

## **FACTUAL ALLEGATIONS**

11.     Plaintiff was hired by Defendant, AEM, on June 29, 2009.

12.     Plaintiff's position at AEM was that of Branch Manager assigned to Hammond, LA.  As Branch Manager, Plaintiff oversaw operations and sales for perishable products sold to businesses in Central, Southwest and Southeast Louisiana.

13.     Plaintiff participated in approximately two to three weeks of branch manager training after being hired by AEM.

14.     Plaintiff's direct supervisor from the time he was hired until December 2010 was William Woessner.

15.     Plaintiff participated in weekly conference calls with his direct supervisors and other branch managers from the AEM distribution region.

16.     Soon after Plaintiff was hired by AEM, Plaintiff noticed that AEM did not maintain sufficient refrigerated/frozen warehouse space and/or refrigerated/frozen truck capacity to store the amount of refrigerated/frozen foods in its inventory.

17.     In July of 2009, the AEM Hammond facility maintained freezer storage space for twelve pallets of frozen products and twenty-four pallets of refrigerated products.

18.     In July of 2009, AEM maintained eight delivery trucks which, while plugged into electrical feeders, could hold on average two to three pallets of frozen products and one and a half to two pallets of refrigerated products, depending on the size of the truck.

19.     In July of 2009, AEM would receive inbound deliveries from Americold

Logistics, LLC (hereinafter "Americold") at the Hammond facility in the early morning hours of Tuesdays, Thursdays and Fridays.  Product received on Tuesdays was delivered on Wednesday and Thursday. Product received on Thursday was delivered on Friday. Product received on Friday was delivered on Monday and Tuesday.

20.     In July of 2009, AEM maintained insufficient warehouse space to store properly the amount of frozen and refrigerated products it was distributing to its customers. After receiving pallets from the Americold deliveries, an average of twelve pallets of refrigerated goods were being stored in ambient temperature at the AEM Hammond facility, which reached temperatures as high as the 110's Fahrenheit by midday.  Additionally, pallets of frozen foods were stored in the refrigerated space.

21.     Recognizing that frozen and refrigerated products stored at such high temperatures created unsafe and unsanitary food conditions and violated laws promulgated by the Louisiana Department of Health and Hospitals (hereinafter "DHH"), specifically, Title 51, Public Health – Sanitary Code, Part VI, Chapter 1, Section 123(A) "Foods requiring temperature control shall be held below 45°F or above 145°F, or in the case of frozen food, shall be held at or below Zero°F", on Friday, July 24, 2009, Plaintiff called his direct supervisor, William Woessner. Plaintiff informed William Woessner of his concerns, stating that Plaintiff could not store frozen goods overnight in the refrigerated section or refrigerated goods in ambient temperatures surpassing 110°F, much less over an entire weekend.  William Woessner instructed Plaintiff to (1) store frozen goods in the refrigerated space until they could be loaded on returning delivery trucks in the evening in violation of DHH law; (2) rotate refrigerated goods between the refrigerated space and the ambient warehouse space to keep them "cool", in violation of DHH law; and (3) make his deliverymen return from their deliveries faster.

22.     After Plaintiff's conversation with William Woessner, Jackie Brotherton, AEM Director of Operations, called Plaintiff and also instructed him to rotate product in and out of frozen and refrigerated space to prevent it from thawing as quickly.  Plaintiff stated to Jackie Brotherton that this solution would not work.  Jackie Brotherton became frustrated with Plaintiff. In an agitated voice, Jackie Brotherton told Plaintiff to do it anyway, that the product would re-freeze or refrigerate on the trucks before being delivered and that it was Plaintiff's job to sell the product at all costs.

23.     On Tuesday, July 28, 2009, Plaintiff received another shipment from Americold containing more pallets of frozen and refrigerated product than the AEM Hammond facility could properly store.  Plaintiff again called his direct supervisor, William Woessner, who told Plaintiff that his deliverymen needed to return to the AEM Hammond facility between 2:00 PM and 3:00 PM to alleviate the storing of refrigerated products in ambient temperature and frozen products in refrigeration space by moving the product into the delivery trucks.  Plaintiff told William Woessner that this was impossible because no matter how early the delivery trucks left the AEM Hammond facility, they could not unload their product at their first destination until it opened at 8:00 AM.  Additionally, the delivery routes included destinations which were hours away, including Baton Rouge, New Orleans, Houma, Morgan City, Lafayette and Alexandria. William Woessner responded that Plaintiff needed to figure it out.

24.     Into August of 2009, Plaintiff continued to discuss his ongoing inability to properly store frozen and refrigerated goods at the AEM Hammond facility.  During one of the weekly Friday conference calls, Plaintiff suggested that AEM provide him with a 53-foot air-controlled trailer to alleviate the storage deficiencies.  Plaintiff reiterated this request to Jackie Brotherton and William Woessner on at least a weekly basis.  Plaintiff's requests went

unfulfilled and, oftentimes, Jackie Brotherton or William Woessner would yell at him, denying his requests.

25.     After AEM ignored Plaintiff's requests to either reduce inbound deliveries or provide him with additional freezer/refrigerator space in a 53-foot air-controlled trailer, on Friday, September 25, 2009, an inspector from DHH arrived for an unannounced inspection of the AEM Hammond Facility.

26.     The September 25, 2009 DHH Inspection revealed critical violations of law, all of which Plaintiff had made known to his supervisors on multiple occasions, pleading for help to rectify the issues only to be rebuffed.  The DHH inspection found that "[t]he freezer storage space is not large enough to handle the amount of frozen product that is received. As a result the firm stores the product (that states "Keep Frozen") in the refrigerator where it thaws. Once space is available in the freezer the product is re-frozen for distribution."

27.     On September 25, 2009, the DHH inspector spoke with Jackie Brotherton over the phone during which the inspector noted in their conversation that Jackie Brotherton stated "a freezer trailer will be supplied in order to handle the amount of product that is received to be stored at freezer temperatures. This will be a temporary solution until a permanent one is provided."

28.     Despite Plaintiff's urging, the DHH violations, and Jackie Brotherton's promise to the DHH inspector that a trailer would be installed to alleviate the frozen/refrigerated product storage capacity shortfalls, AEM took no action and continued to ignore Plaintiff's complaints regarding the AEM Hammond facility regarding frozen/refrigerated product storage.

29.     In the months following the September 25, 2009 DHH inspection, instead of reducing or halting business in order to properly address the storage capacity issues at the

Hammond facility, AEM actively sought and obtained dramatically increased amounts of business, even with its insufficient capacity to store and deliver its foods safely and lawfully.

30.     In October 2009, William Woessner, Jackie Brotherton and Christine McGann, AEM human resources director, all came to meet with Plaintiff at the AEM Hammond facility. At this meeting, Plaintiff showed his supervisors the problems with insufficient frozen/refrigerated product storage capacity in the warehouse as well as the insufficient amount of delivery trucks and delivery truck frozen/refrigerated storage space.  In response, William Woessner and Christine McGann reprimanded Plaintiff, telling him "Stop complaining. We are aware of your problems. It's too expensive to fix them. Continue selling your product and continue growing the business."

31.     From October 2009 throughout 2010, Plaintiff's supervisors continued to ignore his requests for more frozen and refrigerated warehouse and truck space and scold Plaintiff for continually complaining of his problems.

32.     On November 4, 2010, DHH issued another Notice of Violations again including Title 51, Public Health – Sanitary Code, Part VI Chapters 1.  The Notice cited the same problems as the September 25, 2009 Notice of Violations including failure to meet the following requirement: "Refrigerated food storage rooms maintained at 45 degrees F or less. Frozen food storage rooms maintained at 0 degrees F or less."

33.     In January 2011, Michael Hughey replaced William Woessner as Plaintiff's direct supervisor and remained in that position until Plaintiff's termination.

34.     During the time period from 2010 until the end of 2011, the volume of product growth sold through Plaintiff's branch doubled.

35.     Throughout 2011, Plaintiff continued to request additional frozen/refrigerated

warehouse and truck storage capacity, and Plaintiff continued to be ignored and was threatened to do his job or else be subject to termination.

36.     In the fall of 2011, Plaintiff's supervisors, frustrated by Plaintiff's continuous complaints regarding violations of law and Plaintiff's resistance to selling thawed and re-frozen product, AEM notified Plaintiff that he was now on the AEM "Performance Improvement Plan" which placed him on a probation period that mandated he reduce the amount of "shrink" -- the damaged product (e.g. thawed) that is discarded and not sellable -- to below one percent, or be subject to termination.   Plaintiff's supervisors made clear that Plaintiff would be terminated unless he (1) sold more product; (2) reduced the amount of damaged products; and (3) grew the business despite having increasingly insufficient warehouse and truck frozen/refrigerated product storage capacity.

37.     On October 21, 2011, DHH inspected the AEM facility and again cited AEM for failure to meet requirements that refrigerated food storage rooms be maintained at 45°F or less and that frozen food storage rooms be maintained at 0°F or less.

38.     On October 24, 2011, DHH sent a letter to AEM outlining the violations from its October 21, 2011 inspection and requesting that AEM outline in detail, in writing, and within 15 days, what actions it had taken to correct existing violations.

39.     On November 1, 2011, Senior Director of Operations for AEM, Russell Handwork, acknowledged the problems at the Hammond facility in an e-mail to AEM employees wherein he also acknowledged that AEM had installed a larger freezer to alleviate their capacity problems but that "immediate relief" was nevertheless still required. Even with the larger freezer, AEM's warehouse freezer capacity was wholly inadequate to properly store its products in accordance with legal requirements due to AEM's continued increase in business volume, which

is acknowledged by Mr. Handwork to include a 91.1% increase in frozen product poundage and 102% increase in case count over the previous 18 months at the Hammond facility.

40.     From the end of 2011 through 2012, Plaintiff continued to request additional frozen/refrigerated warehouse and truck storage capacity, and Plaintiff continued to be ignored and threatened to do his job or else be subject to termination.

41.     After Hurricane Isaac made landfall on August 29, 2012, the AEM Hammond facility lost power for over 24 hours. Plaintiff requested permission from Michael Hughey and Russell Handwork to discard the product and was told that if the boxes were not wet, to sell them regardless of the power outage and temperature increase in the storage facility.  Plaintiff immediately reported this to Christine McGann who told Plaintiff to follow directions and sell the product as instructed or be fired.

42.     In October of 2012, AEM began to build a new warehouse facility to mitigate its frozen food storage capacity problem, which had reached critical levels of inadequacy; however, AEM continued to ignore Plaintiff's requests for additional trucks to facilitate the rapidly increasing volume of frozen/refrigerated product delivered from the Plaintiff's branch.

43.     During construction of the new AEM facility in 2013, Plaintiff informed AEM Operations Manager, William Hatfield, of the problems with insufficient delivery truck capacity that Plaintiff was facing, and would continue to face, even after the new facility was built. William Hatfield ignored Plaintiff's complaint telling him that he would not receive any new trucks.

44.     In April of 2013, AEM's new facility was finally completed, mitigating the frozen food storage capacity problem as it related to warehouse space but doing little to alleviate the outgoing delivery truck storage capacity shortfalls. Additionally, Plaintiff reported to his

supervisors, Michael Hughey and Russell Handwork, that the solid waste disposal dumpster was too close to the facility, creating both a health hazard and a nuisance. Plaintiff's supervisors refused to move the dumpster away from the facility.

45.    Because AEM maintained wholly inadequate refrigerated/frozen product storage capacity in its fleet of trucks, trucks were overloaded in violation of Louisiana Department of Transportation (hereinafter "DOT") weight restrictions and could not maintain the frozen/refrigerated products at temperatures compliant with DHH regulations.

46.    All of Plaintiff's delivery trucks were equipped with GPS units to record hours on duty, off duty and log temperatures.

47.    Due to AEM's refusal to add additional delivery trucks to handle the increased volume of product being delivered, drivers were repeatedly told by Plaintiff's supervisors to shut off their GPS units when their maximum hours were reached, avoid weigh stations that would undoubtedly reveal that the trucks were overloaded and to disable GPS units altogether to avoid detection by DOT officers.

48.    When drivers went over the maximum daily or weekly hours allowed by DOT regulations, Plaintiff was instructed by his supervisors to contact a company representative to reset GPS units to avoid DOT violations. Plaintiff informed his supervisors constantly of the inadequacies of his trucks' storage capacity, as well as the continuously deferred maintenance and repair of the trucks which often led to breakdowns.

49.    Plaintiff's continued complaints to his supervisors regarding the trucks and dumpster issues at the new facility resulted in his requests for help being ignored and his employment at AEM continuously threatened. Finally, in June of 2013 AEM began seeking a way to terminate Plaintiff for cause.  AEM's Senior Manager of Human Resources, Christine

McGann attempted to obtain damning evidence of misconduct on the part of Plaintiff by initiating unprompted interviews of sales representatives under Plaintiff's command.

50.     Despite finding no evidence of misconduct on the part of Plaintiff, on June 27, 2013, AEM terminated Plaintiff's employment based on violations of the Smithfield Code of Business Conduct and Ethics for alleged acts of misconduct relating to "grossly inappropriate comments relating to race, religion and other protected classifications."

51.     Plaintiff's termination letter was written under the JMFG letterhead.

52.     Despite being terminated for cause due to alleged misconduct, Plaintiff requested unemployment benefits on June 28, 2013 and was denied on August 7, 2013.

53.     On August 29, 2013, Plaintiff requested a hearing to appeal the initial decision of the Louisiana Workforce Commission (hereinafter "LWC").

54.     On September 10, 2013, Plaintiff participated in a telephonic hearing before the LWC Appeals Tribunal during which AEM could not provide any evidence in support of its claim that Plaintiff had committed the acts of misconduct allege to have been AEM's cause for Plaintiff's termination.  Consequently, on September 11, 2013 the Appeals Tribunal reversed the initial decision of the LWC, ruling in favor of Plaintiff and reinstated Plaintiff's unemployment benefits.

55.     On September 25, 2013, AEM appealed the decision of the Appeals Tribunal to the LWC Board of Review.

56.     On October 2, 2013, the LWC Board of Review affirmed the Appeals Tribunal's September 11, 2013 decision which found that Plaintiff had committed no misconduct and qualified Plaintiff's unemployment benefits.

57.     Plaintiff was terminated by AEM because of his continued objections to his

supervisors regarding the deplorable state of refrigerated/frozen food storage and delivery at and from the AEM Hammond facility and his numerous disclosures to DHH of unresolved violations of law both actual and threatened.

<u>**COUNT I**</u>

<u>**PROHIBITED REPRISAL FOR**</u>
<u>**DISCLOSURE OF VIOLATION OF LAW**</u>

58.     Plaintiff reiterates and re-alleges paragraphs 11 through 57 as if fully alleged herein under this Count.

59.     Plaintiff brings this action against all Defendants under Title 23 of the Louisiana Revised Statutes, more particularly La. R.S. 23:967 Employee protection from reprisal; prohibited practices; remedies.

60.     Plaintiff advised AEM of violations of law from the time of his employment until the time of his termination in a good faith effort to remedy those problems, comply with state law, and prevent hazards of health caused by inadequate storage and transportation of refrigerated/frozen products.

61.     After AEM refused to remedy the violations of law, Plaintiff disclosed the violations to the DHH on many occasions.

62.     On September 25, 2009, November 4, 2010, October 21, 2011, and February 29, 2012, Plaintiff provided information to DHH who was conducting inspections of the AEM Hammond facility.

63.     On numerous occasions, Plaintiff refused to participate in Defendants' activities, policies and practices that were violations of law.

64.     As a direct result of Plaintiff's actions, AEM terminated Plaintiff on June 27, 2013.

65.     Smithfield Foods and JMFG directed, participated and/or concurred with the termination of Plaintiff.

66.     On October 2, 2013, a Louisiana Office of Regulatory Services Board of Review affirmed that Defendants' termination of Plaintiff was without cause and that Plaintiff thereby qualified for receiving unemployment insurance benefits pursuant to La. R.S. 23:1601(2).

67.     Defendants' termination of Plaintiff was without any cause other than for the sole purpose of reprisal for actions taken by Plaintiff which are protected by La. R.S. 23:967(A).

## COUNT II

## PROHIBITED REPRISAL FOR REPORTING OF ENVIRONMENTAL VIOLATION

68.     Plaintiff reiterates and realleges paragraphs 11 through 57 as if fully alleged herein under this Count.

69.     Plaintiff brings this action against all Defendants under Title 30 of the Louisiana Revised Statutes, more particularly La. R.S. 30:2027 Environmental violations reported by employees; reprisals prohibited.

70.     Plaintiff disclosed to his supervisor activities, policies and practices of Defendants that Plaintiff reasonably believed to be in violation of environmental laws, rules and regulations.

71.     Plaintiff provided information to DHH regarding violations of environmental law by Defendants.

72.     As a result of Plaintiff's reporting of what he reasonably believed to be activities, policies and practices that were in violation of environmental laws, rules and regulations, AEM terminated Plaintiff on June 27, 2013.

73.     Smithfield and JMFG directed, participated and/or concurred with the termination of Plaintiff.

74.    On October 2, 2013, a Louisiana Office of Regulatory Services Board of Review affirmed that Defendants' termination of Plaintiff was without cause and that Plaintiff thereby qualified for receiving unemployment insurance benefits pursuant to La. R.S. 23:1601(2).

75.    Defendants' termination of Plaintiff was without any cause other than for the sole purpose of reprisal for actions taken by Plaintiff which are protected by La. R.S. 30:2027.

## DAMAGES

76.    As a direct result of AEM, JMFG and Smithfield reprisal against Plaintiff, Plaintiff has suffered and continues to suffer damages associated with his wrongful termination.

77.    Plaintiff is entitled to damages including:

a.    Compensatory damages;

b.    Mental anguish and emotional distress;

c.    Back pay;

d.    Benefits;

e.    Reasonable attorneys' fees;

f.    Court costs;

g.    Tripled Damages; and,

h.    Reinstatement and/or whatever additional civil and criminal remedies under any other state, federal, or local law that this Court deems just and equitable.

## PRAYER FOR RELIEF

78.    WHEREFORE, Plaintiff prays for judgment herein against Defendants, AEM, JMFG, and Smithfield, for damages listed herein, to be proven at trial and as are reasonable in the premises.

## **JURY DEMAND**

79.     Plaintiff is entitled to and requests a trial by jury on all counts alleged herein.

Dated:  December 17, 2013                        All of which is respectfully submitted,

                                        */s/ Hugh P. Lambert*

                                        HUGH P. LAMBERT, T.A. (LA Bar #7933)
                                        EMILY C. JEFFCOTT, ESQ. (LA Bar #33204)
                                        CAYCE C. PETERSON, ESQ. (LA Bar #32217)
                                        JEREMY Z. SOSO, ESQ. (LA Bar #31974)
                                        The Lambert Firm, PLC
                                        701 Magazine Street
                                        New Orleans, Louisiana 70130
                                        T: (504) 581-1750; F: (504) 529-2931
                                        hlambert@thelambertfirm.com
                                        ejeffcott@thelambertfirm.com
                                        cpeterson@thelambertfirm.com
                                        jsoso@thelambertfirm.com

                                        *Counsel for Plaintiff*